[No. C064567. Third Dist. Dec. 28, 2012.]

CAROLYN M. YOUNG, Plaintiff and Respondent, v.
CBS BROADCASTING, INC., et al., Defendants and Appellants.

## Counsel

Davis Wright Tremaine, Thomas R. Burke, Rochelle L. Wilcox and Jeff Glasser for Defendants and Appellants.

Ram, Olson, Cereghino & Kopczynski, Karl Olson; Stephen J. Burns; Karlene W. Goller and James W. Ewert for California Newspaper Publishers Association, McClatchy Newspapers, Bloomberg News, Los Angeles Times Communications and Tribune Company, Hearst Corporation, Reuters America, National Press Photographers Association, First Amendment Coalition, Californians Aware, and California Broadcasters Association as Amici Curiae on behalf of Defendants and Appellants.

Christopher H. Whelan, Inc., and Christopher Whelan for Plaintiff and Respondent.

## Opinion

**NICHOLSON, J.**—CBS Broadcasting, Inc. (CBS), telecast a report regarding Carolyn M. Young, a court-appointed conservator. In its report, CBS dramatized allegations against Young of theft and battery while she served as conservator for an elderly woman. Young sued CBS for defamation. CBS filed an anti-SLAPP motion, asserting the First Amendment. Young prevailed in part. CBS appeals. We reverse because Young acted as a public official for purposes of defamation law and failed to show CBS's report was made with actual malice.

### FACTS

Young has worked as a professional conservator and fiduciary for more than 20 years. In November 2006, and at the request of Sacramento County Department of Health and Human Services, Adult Protective Services (APS), Young petitioned the trial court to be appointed as conservator for 86-year-old Mary Jane Mann. APS was seeking the conservatorship to protect Mann from undue influence by one of her adult daughters, Carol Mann Kelly. It had

evidence Mann suffered from memory impairment and that Kelly was attempting to take advantage of Mann financially. The court granted the petition and named Young as temporary conservator.

About one month later, Mann, Kelly, and another of Mann's daughter's, Monika Mann, reached agreement in a nonjudicial mediation on how to protect Mann in the least restrictive manner. Their attorneys, and Young and her attorney, participated in the mediation. The parties agreed to seek the dismissal of the temporary conservatorship and to name Young as a cotrustee with Mann over Mann's trust. In February 2007, the trial court entered an order dismissing the petition for conservatorship and approving and ordering execution of the mediated agreement.

Dave Clegern was a producer at KOVR-TV Channel 13. In February 2008, about one year after the court terminated Mann's conservatorship, Clegern visited Young at her office and interviewed her about her role as Mann's conservator. From Young's perspective, the interview did not go well. Clegern accused her of creating the conservatorship without justification and without notifying Mann. He also raised accusations that Young had mismanaged trust funds.

Young denied all of Clegern's accusations. In trying to justify her actions, she inadvertently gave Clegern a copy of the confidential report APS had prepared to support creating the conservatorship, including copies of Mann's medical records. Young and her attorney later that day asked Clegern to return the report, but he never did.

On February 27, 2008, about one week after Clegern interviewed Young, KOVR aired a report during a news broadcast concerning Mann's conservatorship. The report was part of KOVR's "Call Kurtis" investigative reports series. Entitled "A Life Hijacked," the report was written and produced by Clegern and reported by Kurtis Ming. KOVR also posted the same report in written and video format to its Web site, where it remained for a number of days.

We have viewed the broadcast report "A Life Hijacked" and the transcripts of the report provided by the parties. In general, the report consisted of interviews with Mann and Kelly, along with furtive shots of Young. During the interview, Mann accused the people managing her conservatorship, more than one time, of stealing from her and threatening her. She also claimed "they" pushed their way through Mann to get inside her home without her permission. One scene, enhanced with a loud clanging noise and music, showed Mann locking her front gate with a large chain to keep those people out. CBS identified Young as one of those people.

Ming reported that Young effectively took over Mann's life without Mann's knowledge. Young took control of Mann's bank accounts, investments, and her trust. Young had Mann's mail forwarded to her office and had Mann's driver's license lifted. At one point, Kelly said Mann called her concerned that somebody had taken $30,000 out of her account, and she did not know how that had happened.

Ming stated Mann's trust was paying for "every legal maneuver aimed at taking away [Mann's] control of her life, and there seemed to be little she could do about it."

The report never showed an interview with Young. Instead, when the report showed her, it did so using calculating filming techniques and sound effects, such as showing her in slow motion as a passenger in a car, or filming her from behind as if spying on her and without her knowledge. These techniques served to substantiate Mann's accusations against Young.

Ming quoted from the confidential APS report. He stated APS recommended Mann be conserved because of memory impairment and possible financial abuse by Kelly. The APS report relied on medical records, but Ming stated one of the doctors quoted in the APS report determined that while Mann did have some memory loss, she showed no signs of "significant neurodegenerative disorder." Ming reported that Mann had since undergone two more exams that found Mann to be quite competent. Mann had no memory disorder and was in fact competent.

Concluding his report, Ming stated that even though the conservatorship had ended a year previously, Mann had been pressured into signing the agreement that kept Young as a cotrustee on her estate. Ming also said Mann accused Young of taking $60,000 out of the trust without adequate accounting.[1]

The following day, February 29, 2008, KOVR broadcast a followup report on the Mann conservatorship. This report focused more on conservatorships in general and did not mention Young by name.

Requests by Young's attorneys to KOVR to retract the report and remove it from its Web site went unanswered.

Ultimately, Young brought this action for defamation against KOVR, Clegern, Ming, CBS, and CBS 13. In an amended complaint, she alleged 26 statements in the broadcast report defamed her.

---

[1] We provide a transcript of the report in appendix A of this opinion.

Defendants (collectively CBS) filed an anti-SLAPP motion against the entire complaint. CBS argued (1) the alleged defamatory statements were absolutely privileged under Civil Code section 47, subdivision (d)(1), as fair and true reports of an official proceeding; (2) the statements were nonactionable hyperbole or opinion; (3) Young was a public official or public figure required to establish actual malice to prove defamation, and she could not do so; (4) many of the statements were not "of and concerning" Young; and (5) Young's alleged failure to comply with Civil Code section 48a, a statute limiting an award of damages from a broadcast defamation to special damages unless certain demands for retraction were made, limited Young's recovery to special damages, damages which she had allegedly not pleaded or proven adequately. CBS also argued at the hearing that Young had failed to demonstrate the statements in the report were false.

The trial court granted the anti-SLAPP motion in part and denied it in part. It determined some of CBS's statements in the broadcast were privileged under Civil Code section 47, subdivision (d)(1), and some were nonactionable hyperbole or opinion. But it found 17 of the statements were not privileged or hyperbole, and that the action could proceed as to those statements.[2]

The trial court rejected CBS's other arguments. It concluded Young was not a public official or public figure and thus not required to show actual malice. It found the statements were of and concerning Young, as she was a direct object of the report's criticism. It also determined Young had shown she could prove special damages, so the operation of Civil Code section 48a was irrelevant to resolving the motion.

CBS appeals and raises the same arguments it raised in the trial court.[3]

## DISCUSSION

### I

### *Standard of Review*

■ Code of Civil Procedure section 425.16 (the anti-SLAPP law) allows a court to strike a complaint it determines is an attempt to stifle a defendant's exercise of free speech rights. A court may strike such a complaint where it concludes (1) the cause of action arises from the defendant's exercise of free

---

[2] A transcript of the 17 statements appears in appendix B of this opinion.

[3] CBS sought judicial notice from the trial court and this court of certain documents. Both courts denied CBS's requests. Although CBS referenced those documents in its briefing, we have not reviewed or relied upon them.

speech regarding a public issue and (2) there is no probability the plaintiff will prevail on the merits. (Code Civ. Proc., § 425.16, subd. (b)(1).)

■ Young does not contest that her complaint arises from CBS's exercise of free speech rights. We thus are left to determine the second prong of the anti-SLAPP motion: whether Young introduced sufficient evidence to establish a probability of success on the merits of her defamation claim. To recover for defamation, Young must establish that the news report was false, defamatory, and unprivileged, and that it had a natural tendency to injure or that it caused special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720 [54 Cal.Rptr.3d 775, 151 P.3d 1185]; Civ. Code, §§ 45, 46; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782.) **(3)** In response to an anti-SLAPP motion, however, her burden of proof is admittedly low, requiring that she introduce substantial evidence of each element on which an ultimate verdict in her favor could be affirmed. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 [124 Cal.Rptr.2d 530, 52 P.3d·703].)

"Review of an order granting or denying a motion to strike under [Code of Civil Procedure] section 425.16 is de novo. [Citation.] We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' ([Code Civ. Proc.,] § 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

■ CBS argues Young failed to introduce sufficient evidence to establish any of the elements of her cause of action. We conclude Young failed to introduce sufficient evidence establishing the news report was unprivileged. The report was privileged because Young acted as a public official for purposes of defamation liability in her role as Mann's court-appointed conservator, and she was unable to establish with sufficient evidence that the report's allegations were made with actual malice. Because this determination conclusively defeats Young's action, we do not address CBS's other arguments.

II

*Young as a Public Official*

■ CBS claims Young is a public official or a limited public figure who, under *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–280

[11 L.Ed.2d 686, 706, 84 S.Ct. 710], must prove CBS published the defamatory statements about her with actual malice, or, in other words, with knowledge of the statements' falsity or in reckless disregard of their truth or falsity. CBS also asserts Young's evidence does not satisfy this burden.

Young contends she is neither a public official nor a limited public figure, and as a result was not required to establish actual malice. We conclude she is a public official for purposes of defamation liability while serving in her role as a court-appointed conservator.

■ "[T]he Supreme Court's vision of a 'public official' is someone in the government's employ who: (1) has, or appears to the public to have, substantial responsibility for or control over the conduct of governmental affairs; (2) usually enjoys significantly greater access to the mass media and therefore a more realistic opportunity to contradict false statements than the private individual; (3) holds a position in government which has such apparent importance that the public has an independent interest in the person's qualifications and performance beyond the general public interest in the qualifications and performance of all government employees; and (4) holds a position which invites public scrutiny and discussion of the person holding it entirely apart from the scrutiny and discussion occasioned by the particular controversy." (*Mosesian v. McClatchy Newspapers* (1988) 205 Cal.App.3d 597, 608–609 [252 Cal.Rptr. 586]; see *Rosenblatt v. Baer* (1966) 383 U.S. 75, 84 [15 L.Ed.2d 597, 604–605, 86 S.Ct. 669].)

■ We recognize Young is not a government employee. Government employment, however, is not a dispositive factor where the plaintiff in all other respects serves as a public official. (See *Ghafur v. Bernstein* (2005) 131 Cal.App.4th 1230, 1239 [32 Cal.Rptr.3d 626] [superintendent of private charter school system held to be a public official where charter schools under Cal. law are considered part of the public school system]; *HBO v. Harrison* (Tex.App. 1998) 983 S.W.2d 31, 37–38 [private court-appointed psychologist held to be a public official where family court gave him power to decide issues of visitation].)

■ "[T]he touchstone for public official status is the extent to which the plaintiff's position is likely to attract or warrant scrutiny by members of the public. Such scrutiny may follow either because of the prominence of the position in the official hierarchy, or because the duties of the position tend naturally to have a relatively large or dramatic impact on members of the public." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1611 [284 Cal.Rptr. 244] (*Kahn*).)

The *Kahn* court determined a publicly employed social worker was a public official for purposes of defamation liability. Although the social worker

did not have any significant control over governmental policy, she possessed considerable power over the lives affected by her work as a child welfare worker. This power made her to the families of the children she served " 'the very epitome of government.' [Citation.]" (*Kahn, supra*, 232 Cal.App.3d at p. 1612.)

The *Kahn* court wrote: "Nothing in the record before us indicates plaintiff had any significant control over governmental *policy*. The same may be said, however, of a patrolman. Nonetheless, the power exercised by police officers, and their public visibility, naturally subject them to public scrutiny and make them public officials for purposes of defamation law. Plaintiff too possessed considerable power over the lives affected by her work as a child welfare worker. Her assessments and decisions directly and often immediately determined whether the educational, social, medical and economic needs of developmentally disabled children in her care would adequately be met." (*Kahn, supra*, 232 Cal.App.3d at p. 1611, original italics.)

Young's work and position were analogous to those of the social worker found to be a public official in *Kahn*. Young exercised significant sovereign power in assuming control of Mann's affairs. Pursuant to APS's request and court authority, she became the face of government assigned to take control of Mann's personal and financial affairs. This is an extraordinary power for the court to bestow upon a person. Of course, it is done with cause and under procedures designed to safeguard the individual as much as possible. But it is only through the power of the state that a person such as a conservator can "co-opt" another person's independent discretion and his or her liberty, and, in addition, force the affected person to pay for it. (Prob. Code, §§ 2430, 2640.)

■ Young is a professional fiduciary licensed by the state Department of Consumer Affairs and subject to comprehensive regulatory and ethical standards. (Prob. Code, § 60.1; Bus. & Prof. Code, §§ 6501, subd. (f), 6502, 6530, 6533; Cal. Code Regs., tit. 16, § 4470 et seq.) Although not all licensed professionals are public officials, such as teachers (*Franklin v. Benevolent & Protective Order of Elks* (1979) 97 Cal.App.3d 915 [159 Cal.Rptr. 131]), Young acted in a capacity beyond that of a teacher. Before the appointment of a conservator is effective, the conservator is required to take an oath to perform his or her duties according to the law. (Prob. Code, § 2300.) By her court appointment and under oath, Young became an agent of the state with the power to interfere in the personal interests of a private citizen to whom she was not related and without that citizen's consent.

■ Unless a court orders otherwise, a temporary conservator over the person and estate of someone is authorized by law to marshal assets and establish accounts at financial institutions, and to consent to emergency

medical treatment for the conservatee, all without the conservatee's consent. (Prob. Code, §§ 2252, subd. (b)(2), (3), 2354, subd. (c).) The trial court may also grant the conservator any additional powers it deems necessary to protect the conservatee's interests. (Prob. Code, § 2252, subds. (c), (d), (e).)

A person holding these sovereign powers over another unrelated person and using them for compensation is subject to the public's independent interest in her performance, and warrants public scrutiny beyond that occasioned by the controversy with Mann. An appointed conservator such as Young derives her authority from "the *parens patriae* power of the state to protect incompetent persons." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 535 [110 Cal.Rptr.2d 412, 28 P.3d 151].) The delegation of this government power to a private individual for compensation, and the power's interference with individual liberty, rightfully attracts public scrutiny. Young has been performing this work for more than 20 years. Ming reported that at the time of the broadcast, Young had approximately 100 conservator clients. Surely the government has a strong interest in ensuring its power directly impacting the lives of so many individuals is not abused. A person such as Young who by court appointment exercises that power for the benefit of a nonrelative and for compensation thus does so as a public official for purposes of defamation liability.

Because we conclude Young acted as a public official, we need not address CBS's alternative argument that Young acted as a limited public figure. Because Young was a public official, she was required to introduce sufficient evidence to establish CBS acted with actual malice in order to proceed with her lawsuit. We review that issue next.

III

*Evidence of Actual Malice*

CBS claims Young cannot recover on any of the allegedly defamatory statements because she did not meet her constitutional burden of showing CBS made the statements with actual malice, i.e., with knowledge of their falsity or with reckless disregard of their truth or falsity. We agree with CBS.

"Actual malice . . . requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of 'reckless disregard' 'cannot be fully encompassed in one infallible definition,'

(*St. Amant* v. *Thompson*, 390 U. S. 727, 730 [20 L.Ed.2d 262, 88 S.Ct. 1323] (1968), we have made clear that the defendant must have made the false publication with a 'high degree of awareness of . . . probable falsity,' (*Garrison* v. *Louisiana*, 379 U. S. 64, 74 [13 L.Ed.2d 125, 85 S.Ct. 209] (1964), or must have 'entertained serious doubts as to the truth of his publication,' (*St. Amant, supra*, at 731)." (*Harte-Hanks Communications v. Connaughton* (1989) 491 U.S. 657, 667 [105 L.Ed.2d 562, 576, 109 S.Ct. 2678].)

■ " '[Evidence] of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.' [Citations.] A failure to investigate [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations]—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.

"We emphasize that such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher. [Citations.] The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 257–258 [208 Cal.Rptr. 137, 690 P.2d 610], fn. omitted.)

■ In opposing an anti-SLAPP motion, a defamation plaintiff need not establish malice by clear and convincing evidence, the standard applicable at trial. Rather, the plaintiff must meet her minimal burden by introducing sufficient facts to establish a prima facie case of actual malice; in other words, she must establish a reasonable probability that she can produce clear and convincing evidence showing that the statements were made with actual malice. (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1578–1579 [27 Cal.Rptr.3d 863].)

The most damaging statements made against Young were Mann's assertions and CBS's inferential claims that Young committed criminal acts against Mann. Mann claimed Young stole from her, threatened her, trespassed against her, and committed battery upon entering her property. One statement specifically alleged Young took $60,000 from Mann's account without making an appropriate accounting. CBS's surreptitious filming of Young, presented in the context of these criminal allegations, further conveyed the image that Young was a criminal.

The other statements against Young implied she had obtained the conservatorship improperly. They implied Young obtained the conservatorship with inadequate and unsupported medical evidence. They also implied she obtained and operated the conservatorship without giving notice to Mann and without giving her an opportunity to respond to the conservatorship's effect. The statements accused Young of unduly restricting Mann's freedom of movement and of pressuring Mann into signing the mediated agreement.

■ Young denied all of these accusations in her interview with Clegern before the broadcast aired. However, because she is a public official, denials alone do not establish malice. "[T]he press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.' [Citation.]" (*Harte-Hanks Communications v. Connaughton, supra*, 491 U.S. at p. 692, fn. 37.) "A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality." (Smolla, Law of Defamation (2d ed. 2009) § 3:65.50, p. 3-96, fn. omitted.)

Young argues that, in addition to her denials, she demonstrated actual malice based on CBS's reliance on Mann and Kelly, who she claims were unreliable witnesses, and its failing to interview other witnesses and consult relevant documentary sources that could have disproved Mann's allegations. On the facts of this record, however, we cannot conclude Young has established a reasonable probability that the defamatory statements were made with actual malice.

■ Young first faults CBS for relying on Mann and Kelly in light of information about them contained in the APS report Young gave Clegern before the news report was aired. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*St. Amant v. Thompson, supra*, 390 U.S. at p. 732, fn. omitted.) Here, reasons to doubt Mann and Kelly were not obvious.

Young claims CBS knew Mann was unreliable because the APS report noted Mann was suffering from memory impairment. Mann had been referred to APS by a social worker at Kaiser Permanente due to memory problems. Rosemary Milich, the APS investigator who prepared the APS report, and a second social worker had noted that in their contacts with Mann, Mann became confused and forgetful. She repeated stories regarding her family but could not remember conversations with Milich from the previous day. Mann also had a history of getting lost while driving.

Other portions of the APS report documented some memory and cognitive impairment. We have received Mann's medical records contained in the APS report. Without disclosing their specific content, we note they contain evidence of some memory and cognitive impairment. Young asserts this evidence shows CBS's reliance on Mann was unreasonable.

However, Clegern had interviewed Mann personally, and he could assess for himself whether she was suffering from obvious memory impairment. In addition, the medical records contained some evidence that Mann in fact did not suffer from any type of memory or cognitive impairment. With this conflicting picture of Mann, we cannot say Clegern's reliance on Mann was reckless.

Young also claims CBS knew Kelly was unreliable. The APS report had concluded Kelly was taking advantage of Mann financially. According to the report, Kelly helped Mann amend her trust five times between August and November 2006, including naming herself as the sole beneficiary. Kelly also attempted to change Mann's stocks, the deed of her home, and her bank accounts into Kelly's name. Kelly had also been involved in the estates of two relatives in North Carolina, resulting in, what were to APS, questionable results. The APS report included a letter from Mann addressed to an investment house denying she had ever appointed Kelly as her agent or given her power of attorney, and revoking any document that claimed she had.

However, the APS report cited no source to support its allegations of undue influence by Kelly. Clegern asked Mann about the accusations regarding Kelly, and Mann called them lies and "bullshit." Mann also told Clegern a North Carolina court had called her to tell her that Kelly was not guilty of anything. Kelly told Clegern that old accusations by either her sister Monika or her estranged brother had been revived to deprive her mother of what she had left of her life. Again, based on this conflicting evidence about Kelly, we cannot say Clegern was reckless for relying on her.

In addition to faulting CBS for relying on Mann and Kelly, Young claims CBS was reckless for not interviewing other persons with knowledge of the events. Young referred Clegern to Mann's other two children, Monika and an estranged son; Mann's attorney, Laurence Dashiell; Monika's attorney; Mann's doctors at Kaiser Permanente; a probate investigator; a private social worker who interviewed Mann; and Young's attorney. Young claims Clegern's failure to contact these individuals upon learning of her denials and the information in the APS report demonstrates Clegern acted in reckless disregard of the truth or falsity of Mann's accusations.

However, Clegern attempted to interview several of these people. He contacted Monika, but she said she could not talk about the case and directed him to contact Young and her attorneys. Clegern also contacted one of Mann's two attorneys, Laurence Dashiell. Young had told Clegern that Dashiell could verify she had accounted for all expenditures she made from the trust, but Dashiell refused to talk with Clegern and referred him back to Young. Clegern contacted an adult protective services agency in North Carolina to inquire about Kelly, but whatever agency he contacted said they had no information. After Clegern interviewed Young, he called an APS public information officer, APS investigator Milich who had initiated the conservatorship proceeding, and a Kaiser Permanente representative. None of these parties would speak with Clegern on the grounds of confidentiality.

Despite these efforts, Young faults Clegern for not also contacting other interested witnesses. But Clegern's decision not to contact all possible witnesses Young thinks could discuss this topic does not constitute actual malice. Failure to investigate, even when that failure is unreasonable, does not by itself prove actual malice. (*St. Amant v. Thompson, supra,* 390 U.S. at p. 731.) Even if Clegern had contacted all possible witnesses, many of them would likely not have spoken with him due to the confidential nature of their relationship with Mann.

More troubling for Young's complaint is the fact that of all the witnesses Young wanted Clegern to contact, only one, Mann's attorney, Mr. Dashiell, could verify whether Young had in fact not accounted for $60,000 or otherwise mismanaged Mann's estate. And Dashiell refused to speak with Clegern. No one else could or would talk to Clegern who could prove or disprove Mann's claim of criminal behavior by Young. The evidence thus shows Clegern was not reckless in investigating this matter and attempting to speak with other witnesses.

We cannot conclude from this record that Young has shown a reasonable probability she can establish by clear and convincing evidence that the statements in the report were made with actual malice. Evidence concerning Mann's and Kelly's reliability was conflicting, and Clegern made reasonable efforts to investigate the matter. Because we find insufficient evidence of actual malice, Young has failed to demonstrate she is likely to succeed on the merits of her defamation complaint. Thus, the anti-SLAPP motion was improperly denied.

## DISPOSITION

The judgment is reversed. We direct the trial court to grant the anti-SLAPP motion in its entirety and to dismiss the amended complaint. Costs on appeal are awarded to CBS. (Cal. Rules of Court, rule 8.278(a).)

Raye, P. J., and Mauro, J., concurred.

### APPENDIX A

What follows is a transcript of the news report, "A Life Hijacked," that includes our descriptions of the scene and the speaker at each stage. This transcript is based on a transcript provided by CBS and on our viewing of the broadcast report.

[Newscaster one:] "If you suddenly found someone else's name on your accounts, and taking your mail, you'd figure your identity had been stolen."

[Newscaster two:] "But a Sacramento woman found what happened to her is legal, and could happen to nearly anybody.

"Call Kurtis has been looking into this."

[Ming:] "Mary Jane Mann tried to do things right. [¶] She worked and saved for decades for an active and comfortable retirement. [¶] But now she says a little understood part of the court system is being used to deprive her of her rights, her happiness and her property."

[Scene: Mann inside her house speaking with reporter.]

[Mann:] " 'But to feel that I'm a prisoner! Why am I a prisoner? Because they want to steal my money. That's all it's about.' "

[Ming:] "Mary Jane Mann is angry. [¶] But she says she's also terrified."

[Mann:] " 'I wake up crying at night. I just can't believe this is happening.' "

[Scene: Mann showing certificates and photos to reporter.]

[Ming:] "After decades running non-profit organizations and volunteering in every community in which she's lived, Mary Jane says she managed a comfortable retirement."

[Scene: Mann outside her house putting a chain and lock on her front gate.]

[Ming:] "But this spry 86-year[-]old now keeps her front gate padlocked against people she says are trying to steal her rights as an [A]merican, and her nest egg."

[Scene: Mann demonstrating with her hands how people push their way in.]

[Mann:] " 'When they come to the front door they just push themselves in!' "

[Scene: Loud slamming or banging noise while showing a chain and a lock on a gate; then, in succession, shots of a man carrying a briefcase, a black Acura MDX with license plates concealed (the car belongs to Young's daughter), and the Sacramento County Ridgeway Courthouse.]

[Ming:] "Mary Jane Mann says the people threatening her don't wear masks, or carry guns. [¶] They wear suits, drive nice cars, and have turned a law designed to protect seniors and the disabled into a club."

[Scene: Mann inside her house.]

[Mann:] " 'They said because papers have been filed, you are incompetent.' "

[Scene: Mann displaying a certificate of recognition and playing cards with daughter Kelly.]

[Ming:] "But nothing in Mary Jane's record indicates she's incompetent. [¶] Her work, volunteer and investment history show a track record of solid competence.

"And since this all started, her doctors have tested her, and certified that she's sound."

[Scene: Mann speaking to reporter.]

[Mann:] " 'I'm not incompetent, I haven't committed any crime, it's just that someone's trying to steal my money! And make me incompetent!' "

[Scene: Loud clanging noise; then Mann and Kelly playing cards.]

[Ming:] "So who's doing this? [¶] And how?"

[Kelly:] " 'She's not allowed to leave, she's not allowed to sell her house.' "

[Scene: Kelly getting food out of the refrigerator and giving it to Mann.]

[Ming:] "Carol Kelly is Mary Jane's oldest daughter. [¶] Her mom called her in from North Carolina to help figure out what's happening to her."

[Scene: Loud clicking noise with camera trying to focus on a picture of daughter Monika.]

[Ming:] "Mary Jane says when she talked about moving to North Carolina near Carol, a younger daughter, Monika, who lives in the Bay Area, went to an attorney. [¶] Mary Jane says Monika apparently worried about being left out of her mom's trust."

[Scene: Picture of Monika; then Mann in her house.]

[Mann:] " 'She didn't want me to ever leave California. I hardly ever see her.' "

[Scene: Picture of Sacramento County Ridgeway Courthouse and California flag.]

[Ming:] "The case ended up with a Sacramento fiduciary appointed by emergency court order to be Mary Jane's conservator; basically, taking over her life."

[Scene: Mary Jane running away from the camera towards her home.]

[Ming:] "But Mary Jane wasn't told about the hearing to decide her future. She found out the hard way."

[Scene: Mann in her house speaking to the reporter.]

[Mann:] " 'I got a bank statement, and I found this person's name on my bank statement.' "

[Scene: Loud banging or clanging noise, then quick, scattered, and fuzzy pictures of moving cars, with the camera freezing momentarily on a car showing Young as the passenger while the car drives away in slow motion.]

[Ming:] "That conservator is Carolyn Young, who says she's handling about 100 conservatorships right now."

[Scene: Obstructed view to see Young from behind and walking away from the camera between cars in a parking lot as if the camera is spying her, then a closeup shot of Young's business nameplate outside her office.]

[Ming:] "Without Mary Jane's knowledge, Young had taken over her bank accounts, investments, and her trust. [¶] Mary Jane suddenly found her mail routed to Young's office and her driver's license lifted."

[Scene: Mann and Kelly speaking with reporter.]

[Ming:] "3,000 miles away, Carol Kelly was alarmed."

[Kelly:] " 'She called me, and she said, Carol, I've got my statement here, and somebody took $30,000 out of my account, how did this happen?' "

[Scene: Mann playing cards.]

[Ming:] "It turned out Mary Jane's personal trust was paying for every legal maneuver aimed at taking away her control of her life . . . and there seemed to be little she could do about it."

[Scene: Distance shot of Young going into her office behind a metal fence and railing.]

[Ming:] "Because that's the power a conservator is given by the court."

[Scene: Ming in the studio and holding up a document.]

[Ming:] "A court can appoint a conservator when someone loses the capacity to care for themselves, or their affairs. That's only supposed to happen without the person's knowledge, in an emergency. In Mary Jane Mann's case the result was this petition to appoint Carolyn Young her conservator. So how did this petition get drafted appointing Carolyn Young Mary Jane's conservator?"

[Scene: Photo of Monika, then a still shot of Young in the passenger seat of her daughter's car.]

[Ming:] "Monika Mann and Carolyn Young both deny starting this process. [¶] They point the finger squarely at Sacramento County Adult Protective Services."

[Scene: Pictures of the Sacramento County APS Web site; then the obstructed view of Young walking away from the camera as if the camera is spying on her.]

[Ming:] "Carolyn Young gave us this confidential report by an APS investigator."

[Scene: Picture of documents labeled as the "APS Report," with certain words highlighted.]

[Ming:] "It recommends Mary Jane Mann be conserved because she suffers from quote: 'memory impairment,' and possibly dementia. The report also paints a picture of Carol Kelly as a possible threat to her mother."

[Scene: Kelly speaking with reporter.]

[Kelly:] " 'The petition said that something, an emergency order had to be a conservatorship because I was going to kidnap my mother and take her out of state! I mean, these are wild accusations.' "

[Scene: More documents with County of Sacramento letterhead and labeled the "APS Report," with certain words highlighted.]

[Ming:] "The county wouldn't talk about its investigation because it's supposed to be confidential. [¶] But this report cites only two actual sources for all its conclusions about Carol Kelly being a threat to her mom—a local attorney who ended up representing Mary Jane . . . . And Mary Jane's daughter, Monika."

[Scene: Mann and Kelly playing cards.]

[Ming:] "Carol Kelly says the investigator never talked with her, and refused to take her phone calls once the report was issued."

[Scene: Mann speaking with reporter.]

[Mann:] " 'They just want to destroy me, that's all, and in some ways they are.' "

[Scene: Hands typing on a computer, and documents with County of Sacramento letterhead and labeled the "APS Report"; picture of Mann, then highlighted quotes from the APS Report.]

[Ming:] "The report includes a series of e-mails, test results and doctors' conclusions it says back up the idea Mary Jane may be developing dementia. [¶] But in fact, the doctors conclude while Mary Jane does have some memory loss, she's fine otherwise!

"Quote: 'No signs, either by history or on exam of a significant neurode-generative cognitive disorder.' [¶] And 'Judgment and higher level cortical function appear intact, and patient is travelling without difficulty. Patient lives alone without difficulty. Thus her executive function appears intact.' "

[Scene: Mann speaking with reporter.]

[Ming:] "Mary Jane has since undergone two more exams. [¶] Both show she is quite competent."

[Mann:] " 'Who does this?! What's happened to our system?' "

[Ming:] "Mary Jane Mann's temporary conservatorship was terminated last year, but she says she was pressured into signing a letter that keeps Carolyn Young on her trust as co-trustee. [¶] She also says Young has taken at least $60,000 out of that trust without adequate accounting.

"Mary Jane has now hired another attorney to get that agreement thrown out."

APPENDIX B

The following statements are the 17 statements the trial court determined were actionable and about which Young had demonstrated a likelihood of success on the merits for purposes of defeating CBS's anti-SLAPP motion. We use the same numerical designation the parties and the trial court have used for each statement.

Statement No. 3—Ming says: "But now [Mann] says a little understood part of the court system is being used to deprive her of her rights, her happiness and her property."

Statement No. 4—Mann says: "Because they want to steal my money."

Statement No. 6—Ming says: "But this spry 86-year[-]old now keeps her front gate padlocked against people she says are trying to steal her rights as an [A]merican, and her nest egg."

Statements Nos. 7 and 8—The scene shows Mann demonstrating with her hands how people push their way in. Mann says: " 'When they come to the front door they just push themselves in!' "

Statements Nos. 9 and 10—The scene includes loud slamming or banging noise while showing a chain and lock on the gate; then shots of a man carrying a briefcase, a black Acura MDX with license plates concealed (the car belongs to Young's daughter), and the Sacramento County Ridgeway Courthouse. While these scenes are shown, Ming says: "Mary Jane Mann says the people threatening her don't wear masks, or carry guns. [¶] They wear suits, drive nice cars, and have turned a law designed to protect seniors and the disabled into a club."

Statement No. 11—Ming says: "But nothing in Mary Jane's record indicates she's incompetent. [¶] Her work, volunteer and investment history show a track record of solid competence. [¶] And since this all started, her doctors have tested her, and certified that she's sound."

Statement No. 12—Mann says: "[S]omeone's trying to steal my money! And make me incompetent!"

Statement No. 13—In the next scene, Kelly says: "She's not allowed to leave, she's not allowed to sell her house."

Statement No. 15—Ming says: "But Mary Jane Mann wasn't told about the hearing to decide her future. She found out the hard way."

Statement No. 16—The scene opens with loud banging or clanging noises, then quick, scattered, and fuzzy pictures of moving cars, with the camera freezing momentarily on a car showing Young as the passenger while the car drives away in slow motion.

Statement No. 17—Ming says: "Without Mary Jane's knowledge, Young had taken over her bank accounts, investments, and her trust. [¶] Mary Jane suddenly found her mail routed to Young's office and her driver's license lifted."

Statement No. 19—Ming says: "It turned out Mary Jane's personal trust was paying for every legal maneuver aimed at taking away her control of her life . . . and [(what follows is the language the trial court ruled actionable)] there seemed to be little she could do about it.' "

Statement No. 21—The scene shows an obstructed view of Young walking away from the camera as if the camera is spying on her.

Statement No. 25—Ming says: "Mary Jane Mann's temporary conservator-ship was terminated last year, but she says she was pressured into signing a letter that keeps Carolyn Young on her trust as co-trustee."

Statement No. 26—Ming says: "[Mann] also says Young has taken at least $60,000 out of that trust without adequate accounting."