Filed 7/15/21  Service Employees Internat. Union v. Woods CA4/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION et al., |  |
| Plaintiffs and Respondents, | E073677 |
| v. | (Super.Ct.No. RIC1902014) |
| NJOKI WOODS, | OPINION |
| Defendant and Appellant. |  |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Affirmed.

Brian F. Van Vleck and Stuart H. Kluft, for Defendant and Appellant.

Weinberg, Roger & Rosenfeld, Bruce A. Harland, Christina L. Adams, and William T. Hanley, for Plaintiffs and Respondents.

A union and its president sued a former employee of the union for defamation based on a series of statements to a reporter, some of which were quoted in an article the reporter published online.  The former employee contends the trial court erred by denying her special motion to strike the complaint as a strategic lawsuit against public

1

participation (anti-SLAPP motion) pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] We affirm the trial court's ruling.

## I.  BACKGROUND

Plaintiff and respondent Service Employees International Union, United Health Care Workers—West (SEIU) is, according to the complaint, "a labor organization that represents approximately 95,000 healthcare workers in hospitals and clinics throughout California."  Plaintiff and respondent Dave Regan is "an employee and the elected President" of SEIU.  SEIU hired defendant and appellant Njoki Woods as an organizer in May 2015.

On March 1, 2019, "the Senior Labor Reporter with PaydayReport.com," Mike Elk, emailed SEIU seeking comment on certain "claims" Woods had made in interviews with him.  SEIU did not respond to the email.  A short time later, on the same date, Elk published on the website an article based on Woods's claims entitled "Exclusive:  SEIU VP Dave Regan Accused of Sexual Misconduct & Retaliating Against Whistleblowers."  Woods is quoted in the article; indeed, she is the only directly quoted source, though the article also cites other union staff who wished to remain anonymous and unnamed "#metoo activists" as having provided context or support for certain aspects of Woods's statements.

---

[1]  Undesignated statutory references are to the Code of Civil Procedure.

Among other things, Woods told Elk (1) that Regan regularly was drunk at work;[2] (2) that Regan personally engaged in sexual misconduct, and that SEIU more broadly had a culture of sexual favoritism and sexual harassment;[3] (3) that Regan had threatened retaliation against anyone who made allegations against SEIU;[4] (4) that Woods had been required to contribute money and time to support the internal election campaigns of

[2] More specifically, Elk's email to SEIU quoted Woods as saying that "Regan was drunk all the time during the day." In the article, Woods is quoted in the following passage: "'He drinks all the time, everybody knows it,' says Woods who says she smelled alcohol on Regan's breath many times during the work day. 'He was always drunk—it was just the norm.'"

[3] Elk's email to SEIU referred to Woods complaining to SEIU about her supervisor having sex with one of Woods's coworkers, causing Woods to be "asked to compensate and do more work." Elk's email also said Woods told him that Regan, among others at SEIU, "engaged in a culture of sexual favoritism." The article included the following passage: "Woods says she was often forced to work 6-7 days a week and was penalized with reduced pay if she took a day off. Woods said that her workload was heavier because she was forced to often perform the work of a coworker who was having sex with their supervisor . . . ." Another passage described Woods's statements without directly quoting her: "Woods says the example set by Regan's frequent drinking and personal sexual misconduct created a toxic culture where many felt pressure to have sex in order to get ahead." Woods was quoted as stating: "'It was widely discussed amongst members that [Regan] had sexual relations with members and staff'" and "'It's a sexual culture—it was all okay . . . The culture at the time was everybody was having sex with everybody. That's just the culture—sexual favors—that's how people get ahead there.'"

[4] Elk's email to SEIU included Woods's claim that at a December 2017 meeting "Regan went up on a stage[,] flashed the numbers of some attorneys, told people to call those attorneys if something [happened,] then said that SEIU would go after folks if they made allegations." In the article, Woods was quoted as saying: "'Dave Regan was standing on the stage and they put all these numbers to these attorneys and he said 'If you have an issue of sexual harassment then you can contact these attorneys, but you better damn well know that if you bring up allegations against us, you are coming up against a million dollar organization and we will come after you.'"

3

candidates for the SEIU executive board who were favored by Regan;[5] (5) that SEIU had pressured her "not to fight management too much" at certain employers with whom the union had good relations, and even to work with management to get particular union members fired if they criticized union leadership;[6] and (6) that SEIU had failed to address racist behavior within the organization.[7]

Woods has not disputed that she made the statements at issue. To the contrary, in both the trial court and in this appeal, she has repeated and expanded upon her

[5] Elk's email referred to Woods's claim "that SEIU staffers were told they had to give money and campaign on their personal time for Dave Regan's candidates." The article described Woods as saying that her SEIU supervisor (the same one who allegedly was having sex with Woods's coworker) had told her she had to contribute money, as well as donate her personal time and the use of her personal phone, to campaign for candidates for the union's executive board who were favored by Regan. Woods was quoted as saying: "She said you have to do it, it's not a choice."

[6] Elk did not mention this claim in his email to SEIU. The article included the following passage: "Woods says that she felt pressure from SEIU not to fight management too much and that sometimes SEIU would even instruct her to get a member fired if they questioned SEIU's lack of militancy; instructions, which Woods says she refused." Later, the article continued with the same theme: "Woods says she also found herself getting pressured to not push too far with certain companies with whom SEIU had good relations. Indeed, in some situations, if a member criticized SEIU union leadership, Woods says her supervisor [the same one who she alleges had sex with a coworker and pressured her to support the campaigns of Regan's preferred candidates for SEIU executive board positions] was instructed to work with the union member's employer to get that member fired; something that Woods also says she refused to do."

[7] Elk asked SEIU for comment on Woods's statement to him that, after she brought up the situation of her supervisor having sex with a coworker during "an October 2017 meeting . . . [the supervisor] was reported saying 'I am going to get that black bitch fired." In the article, Woods was quoted as saying that she had "'faced racism'" at a previous job, "'but they addressed it at least.'" Also, the article stated that the supervisor "was overheard by Woods['s] coworkers in the office saying 'We are going to get that black bitch fired."

allegations. Her appellate briefing, for example, includes a section entitled "Appellant and Co-Workers Witnessed Respondents Engage and Allow Sexual Favoritism, Racism, Drunkenness, and Potentially Illegal Electioneering." The section is based on her own declaration and that of a coworker submitted in support of her anti-SLAPP motion, and includes some allegations not described in either Elk's email to SEIU or his article, as well as additional details regarding Woods's earlier allegations.

SEIU fired Woods on March 6, 2019, via a letter citing as the basis for termination not only her comments to Elk, but also work related performance and behavioral issues that had previously led to disciplinary letters and a change of assignment. SEIU and Regan filed this lawsuit later that month, alleging a single cause of action for "Defamation—Slander Per Se—Cal. Civil Code § 46."

Woods moved to dismiss the complaint under the anti-SLAPP statute. The trial court denied the motion, finding that Woods had demonstrated that SEIU's claims fall within the protections of the anti-SLAPP statute, but that SEIU had produced evidence sufficient to demonstrate a probability of prevailing on its claim.

## II. DISCUSSION

A. *Applicable Law*

"California's anti-SLAPP statute provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike, unless the court determines . . . there is a probability that the plaintiff will prevail on the claim.'" (*Baral*

5

*v. Schnitt* (2016) 1 Cal.5th 376, 381, quoting § 425.16, subd. (b)(1).) The statute "does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral*, at p. 384.)

"The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619.) "A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16] [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Id.* at p. 620;) "If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success . . . . [The court's inquiry at this second step] is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

"'Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." [Citation.] However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's

6

evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law."""[8] (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325-326.)

B. *Analysis*

Regan and SEIU contend that Woods did not meet her burden on the first prong of the anti-SLAPP analysis to show that their claims arise from conduct described by section 425.16, subdivision (e). In particular, the parties dispute whether the statements were made in connection with an issue of public interest pursuant to section 425.16, subdivision (e)(3). We need not decide that issue. Even assuming their claims arise from conduct protected by the anti-SLAPP statute, Regan and SEIU met their burden on the second prong of the analysis, to make a showing that would be, if accepted by the trier of fact, sufficient to sustain a favorable judgment. On that basis, we affirm the trial court's denial of Woods's anti-SLAPP motion.[9]

"Defamation is 'a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."'" (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1047-1048; see Civ. Code, § 45.) Thus, "[t]he elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged,

---

[8] We need not and do not focus our discussion on the parties' arguments that the trial court's reasoning was incorrect in various respects.

[9] We reserved for consideration with this appeal a request for judicial notice by Woods. The documents that she requests we notice are irrelevant to our analysis, so the request is denied.

and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369 (*Wong*).) The plaintiff must present evidence of a statement of fact, rather than opinion, that is "provably false." (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 809; see also *Letter Carriers v. Austin* (1974) 418 U.S. 264, 283 ["The *sine qua non* of recovery for defamation . . . is the existence of falsehood"].) Nevertheless, "where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation." (*Wong*, at p. 1357; see also *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 113 ["the question is not strictly whether the published statement is fact or opinion, but is instead 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact'"].) An organization such as a labor union may bring a defamation claim in its own name. (See *Daniels v. Sanitarium Assn., Inc.* (1963) 59 Cal.2d 602, 609 [holding that "a labor union may sue for libel of the union as an entity"].)

"Slander is a species of defamation." (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 867.) "A false and unprivileged *oral* communication attributing to a person specific misdeeds or certain unfavorable characteristics or qualities, or uttering certain other derogatory statements regarding a person, constitutes slander." (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242.) The term "slander per se" refers to certain types of slander, enumerated in Civil Code section 46, that require no evidence of actual damages to support compensatory damages. (*Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, 367.) These categories have been interpreted "'to include almost any

8

language which, *upon its face*, has a natural tendency to injure a person's reputation, either generally, or with respect to [the person's] occupation . . . .'" (*Id*. at p. 368.)

A defamation plaintiff who is a public official or public figure, as those terms have been defined in the case law, must prove not only that the challenged statements are false, but also, by clear and convincing evidence, that the defendant acted with "'actual malice.'" (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 280; *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 155 (plur. opn. of Harlan, J.) [applying actual malice standard to public figures that are not public officials].) In this context, "'actual malice'" means the defendant made the statement "'with knowledge that it was false, or with reckless disregard of whether it was false or not.'" (*Nguyen-Lam v. Cao*, *supra*, 171 Cal.App.4th at p. 867 [quoting *New York Times Co. v. Sullivan*, *supra*, 376 U.S. at pp. 279-280].) Thus, for the second prong of the anti-SLAPP analysis, public figure defamation plaintiffs must produce sufficient evidence to "establish a reasonable probability that [they] can produce clear and convincing evidence showing that the statements were made with actual malice" at trial. (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 563.) "Actual malice may be proved by direct or circumstantial evidence," and "[f]actors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased 'may in an appropriate case'" support an inference of actual malice. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1167.)

9

Regan and SEIU produced evidence sufficient to demonstrate legally sufficient claims for defamation—more specifically, slander per se—based on at least some of Woods's statements. Some of the statements at issue are, on their face, implied or express assertions of fact, provable as either true or false. An example is her implication that Regan often drinks alcohol at work via statements that he was "'always drunk—it was just the norm'" and that she had smelled alcohol on his breath many times during the work day. Statements asserting or implying that someone is in the habit of being drunk at work are a paradigmatic example of slander per se. (See *Regalia*, *supra*, 172 Cal.App.4th at p. 368; see also *Swan v. Thompson* (1899) 124 Cal. 193, 199 [statement that "master mariner" was "'in the habit of getting drunk'" falls within Civ. Code, § 46, subd. (3)].) The opposition to Woods's motion was supported by evidence, in the form of declarations from Regan and other SEIU employees, from which a reasonable fact finder could conclude that Woods's statements about Regan's drinking were false.[10] Woods's evidence—her own declaration and that of a coworker—tends to support her contention that her statements to Elk were true, but does not ""defeat[] that submitted by the plaintiff[s] as a matter of law."" (*Flatley*, *supra*, 39 Cal.4th 299, 325-326.)

---

[10] Regan stated in his declaration: "I do not drink alcohol during working hours." His declaration questioned the notion that Woods could have smelled alcohol on his breath: "Given my work location [in northern California] and Ms. Woods'[s] work location [in southern California] and our respective positions in the Union, Ms. Woods would have very little, if any, opportunity to interact with me." Other SEIU employees, including some who commonly worked in person with Regan, declared that they have never seen Regan drunk or drinking during working hours.

Similarly, Woods's statements suggesting that SEIU has at times actively worked against the interests of individual members who have been critical of the union or its leadership are assertions of fact that, on their face, have a natural tendency to injure the union's reputation, and which are either true or false. SEIU produced evidence of falsity, in the form of a declaration by her supervisor disputing Woods's account. Woods's own evidence does not address these alleged statements at all.

The parties dispute whether SEIU and Regan should be considered public figures, and thus whether they also had the burden of making a prima facie showing of "'actual malice.'" Again, this is not an issue we need to decide in this appeal. Regardless of whether SEIU and Regan were *required* to make a prima facie showing of actual malice, they succeeded in doing so. Woods's allegation that Regan often drinks alcohol at work is based on her own purported personal experiences; she asserts that she smelled alcohol on his breath. Similarly, Woods's accusations that she had "felt pressure from SEIU not to fight management too much" and had "sometimes" been instructed to "get a member fired" if the member had criticized the union, are statements purporting to account her own experiences. A finder of fact who concluded Woods's statements were false could therefore reasonably infer that Woods knew very well that her statements were false. Additionally, Regan and SEIU submitted evidence that arguably supports the inference that Woods knowingly and intentionally sought to harm them, by demonstrating a possible motive for doing so. (See *Annette F. v. Sharon S.*, *supra*, 119 Cal.App.4th at p. 1167.) Only weeks before Woods spoke to Elk, she had been disciplined by the union for

11

poor work performance and given a new assignment that she disliked. The new assignment had led to a new dispute with the union over reimbursements, and Woods had gone out on medical leave due to issues she contended were caused by the length of her new commute. A finder of fact reasonably could infer that Woods's statements to Elk were false not because she was mistaken or deluded, but that they were intentionally fabricated because of a desire to retaliate for perceived wrongs. We conclude that Regan and SEIU produced sufficient evidence for a prima facie showing of actual malice.

To be sure, as Woods notes, some of her statements were non-actionable opinion or hyperbole; the assertion SEIU was a "toxic" workplace, for example. There is also room to argue whether, with respect to some of Woods's assertions or implications, Regan and SEIU produced sufficient evidence to demonstrate their falsity.[11] Nevertheless, as discussed above, both SEIU and Regan produced evidence sufficient to sustain a judgment in their favor on their defamation claims based on at least some of Woods's statements. For purposes of defeating Woods's anti-SLAPP motion, that is all that they were required to do.

---

[11] For example, Regan's declaration, as well as declarations from other SEIU employees, disputed that it was "common knowledge" that Regan (and another member of the union's leadership) had sexual relations with union members and staff. But Regan's declaration did not quite flatly deny any such sexual behavior; he stated only that one particular employee who was named by Woods in her anti-SLAPP motion and who has sued the union for sexual harassment does not allege that Regan had sexual relations with her or any other union member or staff person. Thus, it is questionable whether Regan has made a prima facie showing of falsity regarding Woods's statements imputing to him "a want of chastity" in the meaning of Civil Code section 46.

12

Woods proposes that *Baral*, *supra*, 1 Cal.5th at p. 376, required the trial court (and, implicitly, requires this court) to "analyze each act supporting an allegation of protected activity" before reaching the conclusion that her anti-SLAPP motion was properly denied. We disagree. *Baral* acknowledged that allegations pleaded as a single cause of action may encompass multiple claims, and it clarified that when an anti-SLAPP motion "seeks to strike particular claims supported by allegations of protected activity that appear alongside other claims within a single cause of action, the motion cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity." (*Baral*, at p. 392; see also *id.* at p. 393 ["courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity"].) The premise of Woods's motion, however—a premise that we have accepted for the sake of argument—was that *all* of her allegedly defamatory statements constitute protected activity, and that therefore the *entire* defamation cause of action asserted by Regan and SEIU should be stricken. In such a circumstance, it is "sufficient to determine whether *any* of the [defendant's] alleged acts" give rise to a claim for relief that has some merit. (Italics added.) (*Baral*, at p. 391 [discussing *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811]; see *id.*, 51 Cal.4th at p. 820 ["If the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands'"]; see also

13

*Cuevas-Martinez v. Sun Salt Sand, Inc.* (2019) 35 Cal.App.5th 1109, 1119, fn. 3 [where cause of action is "based entirely on protected activity . . . *Oasis*, not *Baral*, applies"].)

To put the same point another way: *Baral* clarifies that "*when* the defendant seeks to strike particular claims supported by allegations of protected activity that appear alongside other claims within a single cause of action, the motion cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity." (Italics added.) (*Baral*, *supra*, 1 Cal.5th at p. 392.) Here, however, Woods did not attempt to identify particular allegations based on protected activity that she contends should be considered separately from concededly unprotected activity. (See *id.* at p. 396 ["At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them"].) Woods simply misunderstands what *Baral* requires in circumstances such as this, where the anti-SLAPP motion seeks dismissal of an entire cause of action—here, "Plaintiff's entire Complaint alleging a sole cause of action for Defamation"—as opposed to seeking only to strike particular claims of protected activity within a cause of action that also includes allegations of unprotected activity. Furthermore, neither the trial court nor this court is obligated to consider whether Woods could have achieved a different result had the motion framed the issues differently.

In short, we assume, without deciding, that Woods met her burden on the first prong of the anti-SLAPP analysis, and we find that SEIU and Regan carried their burdens on the second prong. On that basis, we find no error in the trial court's ruling.

14

## III.  DISPOSITION

The denial of Woods's anti-SLAPP motion is affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

MILLER
Acting P. J.

MENETREZ
J.