Filed 9/9/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOUGLAS McCLINTOCK, | |
| Plaintiff and Appellant, | G046483 |
| v. | (Super. Ct. No. 30-2011-00457082) |
| MICHELLE WEST et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, David McEachen, Judge. Affirmed.

Douglas G. McClintock, in pro. per., for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Bartley L. Becker and Allison A. Arabian for Defendants and Respondents.

\*            \*            \*

This is an appeal from a judgment after a demurrer was sustained without leave to amend. Plaintiff Douglas McClintock sued Michelle West and the Law Offices of Michelle West (collectively the West defendants) for damages resulting from West's purported misconduct while acting as his guardian ad litem during a divorce proceeding. At all times in the underlying case, West was acting under the supervision of an experienced family law judge.

The court sustained the West defendants' demurrer to McClintock's second amended complaint, concluding that the doctrine of quasi-judicial immunity and the litigation privilege, among other things, precluded McClintock's claims. We agree and affirm.

I

FACTS

*A. The Divorce Action*

In 2006, McClintock's wife, Sara,[1] filed for divorce. Sara, like McClintock, an attorney, sought legal and physical custody of the couple's two children and intended to relocate to the Midwest. When the case was called for trial in February 2008, McClintock did not appear. His attorney, Stephen Kaufman, advised the court that he had checked himself into a hospital in Massachusetts for severe depression. The court refused to grant a continuance without evidence of McClintock's condition. The next day, Kaufman presented a letter that had been faxed by a physician. The trial judge stated the letter convinced him that McClintock could not act on his own behalf, and he appointed Michelle West as guardian ad litem. (*In re Marriage of McClintock* (Mar. 8,

---

[1] We refer to Sara McClintock by her first name for the ease of the reader. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475-476, fn. 1.)

2

2012, G044197) [nonpub. opn.].)[2]  On the same day, the court entered an order awarding Sara temporary sole custody of the children.

McClintock claims:  "Judge Naughton unilaterally appointed West without holding a hearing on Appellant's competence and without any evidence in the record that Appellant was anything more than depressed. . . .  (It later became apparent that Judge Naughton unilaterally appointed West in order to give her a huge financial windfall after Appellant was finally able to get her removed two years later.)"[3]

After she was appointed, West spoke to McClintock by phone.  McClintock later alleged he told West his priorities were to regain custody and visitation rights with his children and to divide the marital property through a settlement.

In March, West and Sara signed a stipulation that the custody order was to remain in effect and that West would continue as guardian ad litem for McClintock for all purposes.  McClintock later alleged that in June, West agreed to a request from Sara's attorney to release McClintock's medical records.

West and Kaufman, on McClintock's behalf, then negotiated a stipulated judgment on reserved issues with Sara and her attorney.  The court approved the stipulated judgment on July 1.  Among other provisions, the parties equally divided approximately $1.4 million in retirement accounts.  McClintock was to provide account statements and execute releases to grant Sara access to the accounts, and McClintock was to be responsible for any attorney fees resulting from the failure to do so.  McClintock was to maintain the children's medical coverage.  The stipulated judgment also provided

---

[2] The West defendants' request for judicial notice of that decision is granted, pursuant to Evidence Code sections 452, subdivision (d), and 459.

[3] Throughout his brief, McClintock repeatedly cites to his own complaint as evidence of underlying facts, as opposed to mere allegations.  This is improper, and we treat such statements as if they included no record references at all.

3

for equal division of proceeds from the marital home after an equalization payment to Sara.

McClintock alleges that prior to the hearing on July 1, he tried to speak to West when he saw her in the parking lot, but she refused to speak to him. He alleges that West accused him of "stalking" her after the hearing.

The remaining issues were settled in September, via another stipulated judgment and order on reserved issues. One part of that order stated that $32,000 from the sale of the residence was payable to "Michelle West as an entire flat fee for all past and future services through the division of the marital estate and the house sale . . . as guardian ad litem."

At some point during this period, McClintock apparently filed a motion to relieve West of her duties as guardian ad litem. According to a later declaration filed by Sara, McClintock claimed he had no mental disabilities, yet at the same time, he applied for and was granted full disability based on his mental status.

The stipulated judgment and order entered in September became a final judgment on October 1. The judgment gave sole physical and legal custody to Sara, and stated that McClintock "shall have no contact with the minor children," and that "[a]ny future contact of any kind shall only occur at the request of the minor children through a qualified therapist, and the parties stipulate that this order is not modifiable, except at the request of the minor children." While McClintock blames West for his failure to reunite with his children and the "alienation of the children by Sara," there is evidence in the record that a reunification therapist testified at trial that there was no alienation by Sara, and McClintock was largely responsible for the rift between him and his children.

Around the same time, Sara gave notice of an ex parte motion seeking to shorten time on a motion to give West the authority to carry out the July 1 agreement with respect to the retirement accounts. In her supporting declaration, Sara stated that McClintock had not turned over any retirement account statements by the stipulated

4

deadline. McClintock had also failed to make the equalization payment, independently contacting the escrow agent responsible for the sale of the home and informing the agent that he had a dispute with the July 1 agreement. He had also failed to maintain the children's medical coverage.

Most urgently, given the declining state of the stock market in September 2008, Sara sought to have the retirement accounts divided immediately. She stated: "The Guardian Ad Litem has little control over the Respondent, and the court must make the orders requested in order to allow the assets to be divided pursuant to the terms of the Judgment. The respondent has chosen to ignore this court's orders . . . ." She argued that McClintock's recalcitrance had caused Sara to incur over $140,000 in attorney fees and costs.

The proposed order went further than the July 1 agreement, however, and sought to require McClintock transfer 50 percent of the *value* of the various accounts as of July 1, 2008.[4] Kaufman did not oppose or notify McClintock of the hearing, but filed a declaration asking that each party bear its own costs. The court granted the order as requested and awarded $9,000 in attorney fees and costs to Sara. The court also broadened West's discretion as guardian ad litem, and she was ordered to take all steps necessary to facilitate the transfer of the retirement accounts, as well as to do what was needed to effectuate the judgment.

In 2009, McClintock fired Kaufman and filed for fee arbitration in an advisory proceeding. McClintock claimed that Kaufman was not entitled to *any* attorney fees. He asserted that Kaufman had entered into a stipulation to grant Sara legal and physical custody without his authority, failed to object to the appointment of West or

---

[4] The potential windfall for Sara was precisely the topic of this court's prior opinion, see *In re McClintock*, *supra*, G044197. We need not go into too much detail here, but in sum, West eventually submitted a corrected order to return the division of the retirement accounts to its equal state, which was approved by the court in March 2010. (*Ibid.*)

5

seek to overturn the order, failed to respond to him or act according to his direction, failed to give notice of an ex parte motion, and entered into the stipulation for judgment which resulted in an order for unequal division of property and unreasonable attorney fees and fees for West. West testified on Kaufman's behalf.

The arbitrators concluded that Kaufman was entitled to approximately $31,000 in fees. With respect to West's appointment, the arbitrators stated: "It is also very clear from review of the transcript of the February 13, 2008 proceeding, that the court, in making that appointment [of West as guardian ad litem] was bending over backward to protect the interests of [McClintock], who would otherwise have been required to proceed to trial in absentia. The result of such a default trial proceeding would certainly have been less favorable to [McClintock] than the result reached through the participation of the GAL, acting on [McClintock]'s behalf."

West's services were terminated in March 2010, and she thereafter sought payment of her fees. She petitioned the court for payment of 172.5 hours spent between October 2, 2008 and March 18, 2010, at a rate of $275 per hour for a total of $47,437.50. She submitted a declaration to the court in support of the request. The court granted it, stating that "the services of the Guardian Ad Litem were necessary to the conclusion of the case." Without her services, the court stated, there would have been no resolution of the matter in any reasonable time frame and both parties had benefitted from her services. McClintock was ordered to pay $37,500 and Sara was ordered to pay $10,000. The parties were given 10 days to object to the order, but there is no evidence in the record that anyone did.

The court also ruled on the issue of attorney fees in the divorce case, and ordered McClintock to pay $65,000 in fees. The court felt the fees amassed were "monumental" and with respect to the decision to order McClintock to pay the bulk of them, the court stated: "[Sara] lays the blame for the high attorney fees entirely on [McClintock] with some justification particularly if one believes that that the trip to the

6

hospital in Massachusetts was merely an effort to game the legal system. Were that the case, the ploy failed because the appointment of a guardian ad litem ensured the rapid conclusion of the case to judgment." The court also noted it had warned McClintock "since he didn't seem to be paying any attention to the guardian ad litem who could have and should have resolved the whole thing."

## B. *The Instant Case*

McClintock filed his initial complaint against the West defendants on March 11, 2011. He alleged five causes of action, including negligence, fraud, breach of fiduciary duty, breach of contract and intentional infliction of emotional distress. The gravamen of the complaint was that West's actions resulted in financial losses and the loss of custody of his children. The claims for fraud and breach of contract were based in part on the theory that West had promised to cap her fees at $32,000 pursuant to the September 2008 stipulation.

The West defendants demurred, arguing, among other things, that as guardian ad litem she had quasi-judicial immunity. The court's tentative decision sustained the demurrer, but McClintock then filed an amended complaint, thereby taking the hearing off calendar.

The first amended complaint added causes of action for intentional and negligent interference with prospective economic advantage, but was otherwise substantially similar to the initial complaint. Again the West defendants demurred, again raising quasi-judicial immunity, among other arguments. McClintock opposed, arguing West was not entitled to such immunity. McClintock's counsel failed to appear at the hearing on the demurrer, although McClintock appeared to argue on his own behalf. The court ordered the demurrer sustained, with 30 days leave to amend.

In due course, McClintock, now representing himself, filed a second amended complaint, which is the one at issue here. In addition to the claims included in

7

his first amended complaint (fraud, breach of fiduciary duty, breach of contract, intentional infliction of emotional distress, intentional and negligent interference with prospective economic advantage), he added claims for legal malpractice and substituted a claim for professional negligence for his original negligence cause of action. He also claimed that West was his de facto attorney who breached her professional obligations by failing to provide him with a copy of his files.

The West defendants again demurred. With regard to the new contentions regarding legal malpractice, West asserted that she appeared as McClintock's guardian ad litem, not his attorney. Even assuming she had acted as an attorney on isolated occasions, the primary duty to furnish documents would have fallen to Kaufman, the attorney of record. The West defendants also filed a lengthy request for judicial notice, which was unopposed.

In opposition to the demurrer, McClintock contended that West owed him a duty of care and that she was not entitled to quasi-judicial immunity. He pointed to the stalking incident as evidence that West had acted outside her role as guardian ad litem. McClintock argued that he had adequately set forth sufficient claim as to each cause of action, mostly in an entirely conclusory manner.[5] He did not offer any argument that if the demurrer was sustained, further leave to amend should be granted.

The court granted the request for judicial notice, with the exception of one document, and sustained the demurrer without leave to amend. The court concluded that West was entitled to quasi-judicial immunity on the claims alleging breach of a duty of care. With respect to the fraud and breach of contract claims, the litigation privilege barred any claims based on statements West had made in the divorce proceedings or in

---

[5] For example, with respect to the legal malpractice claim, this was the entirety of McClintock's argument: "As alleged in the SAC, West repeatedly acted in the role of Plaintiff's attorney rather than guardian ad litem. She corresponded repeatedly directly with the other attorney. She advocated as an attorney. The SAC alleges numerous acts of negligence that constitute malpractice."

her application for fees. With regard to the stalking incident, even if outside of West's role as guardian ad litem, McClintock had not set forth any viable theory of causation and damages. The judgment and order of dismissal was subsequently entered.

II

DISCUSSION

A. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We give no effect, however, to contentions, deductions or conclusions of either fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)

"When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

B. *Quasi-Judicial Immunity*

1. *The Role of the Guardian Ad Litem*

Code of Civil Procedure section 372, subdivision (a), states in relevant part: "When . . . an incompetent person . . . is a party, that person shall appear either by . . . a guardian ad litem appointed by the court in which the action or proceeding is pending, or

9

by a judge thereof, in each case. . . . The . . . guardian ad litem so appearing for any . . . incompetent person . . . shall have power, with the approval of the court in which the action or proceeding is pending, to compromise the same, to agree to the order or judgment to be entered therein for or against the ward . . . and to satisfy any judgment or order in favor of the ward . . . or release or discharge any claim of the ward . . . pursuant to that compromise."

"A guardian *ad litem* is not a party to an action, but merely the representative of record of a party."  (*Estate of Cochems* (1952) 110 Cal.App.2d 27, 29.) He or she "represents the interests of a person in legal proceedings who lacks capacity to represent himself or herself . . . ."  (*J.W. v. Superior Court* (1993) 17 Cal.App.4th 958, 965.)  But while a guardian ad litem's role is as a representative of the ward, he or she does not act as an advocate, and does not simply represent the ward's wishes.  "The court is, in effect, the guardian of the minor and the guardian *ad litem* is but an officer and representative of the court.  [Citation.]"  (*Serway v. Galentine* (1946) 75 Cal.App.2d 86, 89.)

While the guardian ad litem has the power to assent to procedural steps that will facilitate a determination of the ward's case (*Torres v. Friedman* (1985) 169 Cal.App.3d 880, 887), the guardian ad litem's authority is that of "'an agent with limited powers.'  [Citation.]"  (*Berry v. Chaplin* (1946) 74 Cal.App.2d 652, 657.)  For example, when a guardian ad litem believes that settling a case is in the ward's best interests, that decision requires court approval.  (Code Civ. Proc., § 372.)  The court has a duty to ensure that the ward's rights are protected by the guardian ad litem.  (*Berry v. Chaplin*, *supra*, 74 Cal.App.2d at p. 657.)  The guardian ad litem, therefore, when representing an adult deemed incapable of representing themselves, is in a similar role to a conservator, who derives his or her authority from the power of the state to protect incompetent persons.  (See, e.g., *Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 562.)

10

*2. Guardians Ad Litem Enjoy Quasi-Judicial Immunity When Acting within the Scope of their Authority*

The seminal California case on quasi-judicial immunity is *Howard v. Drapkin* (1990) 222 Cal.App.3d 843 (*Howard*). The defendant in that case was a court-appointed psychologist who had been appointed to evaluate the plaintiff's child custody dispute. (*Id.* at p. 847.) The plaintiff claimed the psychologist had acted improperly in carrying out that evaluation. (*Ibid.*) The defendant filed a demurrer to the plaintiff's complaint, arguing she had immunity as an expert witness, and the trial court agreed, sustaining the demurrer without leave to amend. (*Id.* at p. 850.) The Court of Appeal ultimately agreed. (*Id.* at p. 857.)

The Court of Appeal provided an overview of common law immunity, beginning with the concept of judicial immunity. "The concept of judicial immunity is long-standing and absolute, with its roots in English common law. It bars civil actions against judges for acts performed in the exercise of their judicial functions and it applies to all judicial determinations, including those rendered in excess of the judge's jurisdiction, no matter how erroneous or even malicious or corrupt they may be. [Citations.]" (*Howard*, *supra*, 222 Cal.App.3d at p. 851, fn. omitted.) "The rationale behind the doctrine is twofold. First, it 'protect[s] the finality of judgments [and] discourag[es] inappropriate collateral attacks.' [Citation.] Second, it 'protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants. [Citation.]' [Citation.]" (*Id.* at p. 852.)

The court then discussed the concept of quasi-judicial immunity, which "extended absolute judicial immunity to persons other than judges if those persons act in a judicial or quasi-judicial capacity." (*Howard*, *supra*, 222 Cal.App.3d at pp. 852-853.) Quasi-judicial immunity has been extended to court commissioners, grand jurors, administrative hearing officers, arbitrators and the organizations sponsoring them, the State Bar and Committee of Bar Examiners, and prosecutors. (*Id.* at p. 853.) "As with

11

the reason for granting judicial immunity, quasi-judicial immunity is given to promote uninhibited and independent decisionmaking. [Citation.]" (*Ibid.*) The court noted that federal decisions had extended immunity to trust officers, conservators, receivers, guardians ad litem, psychologists and attorneys for children in child abuse cases. (*Id.* at pp. 855-856; see also *Kurzawa v. Mueller* (6th Cir. 1984) 732 F.2d 1456, 1458 [guardian ad litem "must act in the best interests of the [person] he represents [and s]uch a position clearly places him squarely within the judicial process"].)

The *Howard* court noted that the "overburdened judicial system" was dependent on attracting independent and impartial services and expertise to function. "Thus, we believe it appropriate that these 'nonjudicial persons who fulfill quasi-judicial functions intimately related to the judicial process' [citation] should be given absolute quasi-judicial immunity for damage claims arising from their performance of duties in connection with the judicial process. Without such immunity, such persons will be reluctant to accept court appointments or provide work product for the courts' use. Additionally, the threat of civil liability may affect the manner in which they perform their jobs. [Citation.]" (*Howard*, *supra*, 222 Cal.App.3d at pp. 857.)

McClintock argues that under *Howard*, quasi-judicial immunity should only apply to "neutral" third parties, and not a guardian ad litem, whose role involves making decisions for her ward. But that is not what *Howard* states, and we believe the test it sets forth is applicable here. The question, under *Howard*, is whether a guardian ad litem fulfills a function that is "'intimately related to the judicial process'" (*Howard*, *supra*, 222 Cal.App.3d at p. 857), and the answer to that question is yes. As we discussed *ante*, the guardian ad litem's role is that of a court-appointed officer, who, under the appointment of and under the supervision of the trial court, must act in her ward's best interests. That is indeed a function intimately related, and indeed, one which the trial court found in this case was indispensible to bringing the case to a conclusion.

12

Further, the policy considerations raised in *Howard* apply here — indeed, this case could be a poster child for such considerations. If West had known she might be subject to liability for causes of action ranging from negligence to intentional interference with prospective economic advantage, resulting in the potential for years of litigation and financial liability greater than her entire fee for handling the case, would she have ever agreed to the appointment? Why would any qualified person ever accept appointment as a guardian ad litem when his or her decisions could be subject to such post hoc second guessing?

Moreover, in addition to the difficulty of finding anyone to accept such an assignment, the risk of liability could impact how the guardian ad litem carried out her role. As we discussed *ante*, the guardian ad litem does not advocate for her ward in the way an attorney does — her job is acting in the ward's best interests, and the ward might not always agree with the guardian ad litem's decisions. Her ability to act would be compromised if the threat of future liability encouraged a guardian ad litem to put a ward's *wishes* above his *interests*. (*Howard*, *supra*, 222 Cal.App.3d at pp. 853, 857.)

The countervailing policy present here is the accountability of guardians ad litem, but there are sufficient mechanisms in place to address such concerns. First, immunity is limited to acts within the scope of the guardian's authority. Second, in addition to a guardian ad litem, wards generally have legal counsel as well, as was the case here. Third, as we have noted, guardians ad litem are appointed by and subject to the supervision of the trial court. The trial court can remove a guardian if he or she is not performing responsibly, either on its own motion or at a party's request. Fourth, the trial court's decisions are ultimately subject to review by an appropriate writ or appeal. Ultimately, both the parties and the judicial system are best served by addressing any issues with the guardian ad litem's performance during the initial case, rather than by a subsequent lawsuit collaterally attacking the original judgment.

13

In opposition to the argument that guardians ad litem are entitled to such immunity, McClintock cites a number of federal cases that do not offer him much help. He points to *Miller v. Gammie* (9th Cir. 2003) 335 F.3d 889, a case that involved immunity for a social worker and a social therapist in a civil rights action under 42 United States Code section 1983. (*Id.* at p. 893-894.) The Ninth Circuit took the view that immunity was dependent on the specific function performed and could not be determined at the pleading stage. (*Id.* at p. 899.) But that case is not dispositive here. As a federal case interpreting a federal statute, it is not binding on this court's interpretation of state law.

That case is also less than instructive here because it does not involve a guardian ad litem. Other federal cases, as the *Howard* court noted (*Howard*, *supra*, 22 Cal.App.3d at pp. 855-856), have found that guardians ad litem are entitled to quasi-judicial immunity. In addition to the cases cited in *Howard,* in *Gardner By Gardner v. Parson* (3d. Cir. 1989) 874 F.2d 131, the court held that "a guardian should be absolutely immune when acting as an 'integral part[] of the judicial process.' [Citation.]" (*Id.* at p. 146.) While most of the federal cases on this issue arise out of guardians ad litem acting in an investigative capacity in child custody proceedings, they do not stand for the proposition that quasi-judicial immunity should or must be limited to that context. (See, e.g., *Cok v. Consentino* (1st Cir. 1989) 876 F.2d 1, 3; *Myers v. Morris* (8th Cir. 1987) 810 F.2d 1437, 1466-1467; *Ward v. San Diego County Dep't of Social Services* (S.D. Cal. 1988) 691 F.Supp. 238, 239-241.)

Other unhelpful federal cases cited by McClintock are *Robinson v. Freeze* (8th Cir. 1994) 15 F.3d 107, a case filed by an inmate against a bailiff under 42 United States Code section 1983, and *Richman v. Sheahan* (7th Cir. 2001) 270 F.3d 430, another civil rights action filed against bailiffs in an Illinois courtroom. While these cases may be, as McClintock argues, "the law of the land" with respect to federal civil rights claims

filed in federal court, they do not apply to a common law action against a guardian ad litem filed in California state court.

In sum, both precedent with respect to other quasi-judicial personnel and policy considerations persuade us that quasi-judicial immunity was appropriately accorded to West in this case. Accordingly, the trial court properly sustained the West defendants' demurrer to the causes of action for professional negligence, breach of fiduciary duty, intentional infliction of emotional distress, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage.[6]

## C. The Litigation Privilege

McClintock argues quasi-judicial immunity cannot apply to his claims for breach of contract or fraud. The basis for those claims is West's fee application after her services as guardian ad litem were completed. McClintock alleges that West, in the September 2008 stipulation, agreed to "cap" her fees, but later sought additional fees, which he claims constituted both breach of contract and fraud. West's request for fees, however, is subject to the litigation privilege.

As pertinent here, Civil Code section 47, subdivision (b) provides: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding . . . ." (Civ. Code, § 47, subd. (b).) "The principal purpose of [Civil Code] section 47[, subdivision (b),] is to afford litigants . . . the utmost freedom of access to the

---

[6] We note that even if quasi-judicial immunity did not apply, many of these causes of action would fail as a matter of law. Interference with prospective economic advantage, for example, requires "an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff." (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 241.) The dissolving marriage alleged here is not the type of economic relationship contemplated by the tort. We will discuss the additional problems with McClintock's claim for intentional infliction of emotional distress *post* in section II.E.

15

courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213.) "Although originally enacted with reference to defamation [citation], the privilege is now held applicable to any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. [Citations.] Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation . . . . [Citations.]" (*Id.* at p. 212.)

West's fee request, as part of the divorce action, was plainly "in the course of a judicial proceeding to achieve the objects of the litigation . . . ." (*Silberg v. Anderson*, *supra*, 50 Cal.3d at p. 212.) McClintock claims the privilege should not apply because he did not have the opportunity to cross-examine West. He is incorrect; he cites no authority for the proposition that the only acts subject to the litigation privilege are those where the parties are subject to full adversarial examination. That would exclude the privilege from the ambit of many trial court proceedings, including all law and motion practice. That is simply not the law. The litigation privilege applies "broadly to bar tort actions based on privileged communications, excepting only the tort of malicious prosecution." (*Haberg v. California Federal Bank* (2004) 32 Cal.4th 350, 358.) Indeed, it is not limited to statements made in a courtroom at all, but also those in contemplation of litigation. (*Id.* at p. 361.)

Here, McClintock had the opportunity to litigate West's fee request as part of the divorce proceedings. The fee request was served on him, and if he filed any opposition, he failed to include it in the appellate record. He was also served with the court's order granting the request. There is nothing in the record indicating that McClintock objected to the order in the 10-day period ordered by the court. If McClintock had an issue with the court's decision, the time to raise it was then, or in the appropriate writ or appeal from that order. Derivative lawsuits like this one are part of the reason the litigation privilege exists — to prevent never-ending second bites at the

16

apple about matters that took place during a prior proceeding. Thus, the litigation privilege bars McClintock's causes of action for fraud and breach of contract.[7]

*D. Legal Malpractice*

Attempting to avoid doctrines such as quasi-judicial immunity or the litigation privilege, McClintock's second amended complaint alleged, for the first time, legal malpractice. The complaint asserts West "repeatedly acted in a role as Plaintiff's attorney" rather than as guardian ad litem. To allege legal malpractice, the plaintiff must demonstrate "the existence of an attorney-client relationship." (*Jager v. County of Alameda* (1992) 8 Cal.App.4th 294, 297 (*Jager*).) The existence of such a relationship is a question of law. (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1733.)

In *Jager*, the plaintiff sued the district attorney for legal malpractice in connection with the collection of child support. (*Jager*, *supra*, 8 Cal.App.4th at p. 296.) The court sustained the defendants' demurrer without leave to amend, holding that "Even our most liberal construction of Jager's complaint does not demonstrate an attorney-client relationship or a duty of care otherwise owed by respondents to Jager." (*Id.* at p. 297.) Based both on statute and prior case law, the court found the duty owed by the district attorney was to the county, not to an individual seeking to collect child support. (*Id.* at pp. 297-298.)

The situation here is similar. While a guardian ad litem's duty is to act in the ward's best interests, as we discussed *ante* in section II.B., he or she does not answer to the ward, but to the court. "[T]he guardian *ad litem* is but an officer and representative of the court." (*Serway v. Galentine*, *supra*, 75 Cal.App.2d at p. 89; see also *Berry v. Chaplin*, *supra*, 74 Cal.App.2d at p. 657 [noting the guardian ad litem is both an officer

_____

[7] To the extent relevant, West's testimony during Kaufman's fee arbitration was also subject to the litigation privilege.

17

and agent of the court].)  Thus, as a matter of law, there is no basis for finding an attorney-client relationship between a guardian ad litem and a ward.

Further, any factual indicia of an attorney-client relationship is completely absent here.  There was no agreement for representation between McClintock and West. There are no allegations that West was attorney of record at any point, appeared in court without Kaufman, signed any document as McClintock's attorney, or was named as attorney in any document.  Indeed, McClintock claims that West refused to speak to him after May 2008, which is hardly indicative of an attorney-client relationship.  In short, there are simply no allegations of an attorney-client relationship sufficient to hold West accountable for legal malpractice.  Because he has failed to adequately allege such a relationship, the demurrer to this claim was properly sustained.

*E.  West's Alleged Actions Outside the Scope of Her Authority*

In a short argument devoid of legal authority, McClintock argues the court should have overruled the demurrer based on West's actions that fell outside the scope of her role as guardian ad litem.  The only such action that McClintock discusses is the so-called "stalking" incident, which he claims led to West's refusal to communicate with him.  He argues this is the most "damaging" thing imaginable, and claims that thereafter West's representation of him was "a total sham."  None of these allegations, however, create a cognizable cause of action.

In his reply brief, McClintock argues West's actions in this respect were "extreme and outrageous."  To the extent that McClintock suggests we analyze these actions under his claim for intentional infliction of emotional distress (even though not alleged in the second amended complaint as such), we will do so.

"'[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show:  (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress;

18

(3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259.) "'Conduct, to be "'outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.' [Citation.]" (*Ibid.*)

As a matter of law, accusing a person of stalking, stating that one is afraid of him, and refraining from contacting them directly thereafter is not "extreme and outrageous" conduct, even in this context. West had other means to learn McClintock's desires, to the extent they were relevant and that she did not already know them, such as by communicating with Kaufman. Even if West's conduct was somehow interpreted as sufficiently extreme or outrageous, there is no allegation or reasonable inference that West's conduct was undertaken with the intent to cause or with the reckless disregard of the probability of causing such emotional distress.

With respect to releasing McClintock's medical records to Sara's attorney, which was the actual pleaded basis for the intentional infliction of emotional distress claim, West's decision to execute the release is subject to quasi-judicial immunity, for the reasons discussed *ante* in section II.B. The court properly sustained the demurrer to this cause of action.

## F. *Leave to Amend*

McClintock did not argue below, and does not argue here, that further leave to amend his complaint is warranted. Given the legal principles set forth above, we find no reasonable probability that McClintock could amend his complaint to state a viable cause of action. The demurrer was therefore properly sustained without leave to amend. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

III

DISPOSITION

The judgment is affirmed.  The West defendants are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.