Filed 4/20/26  Rahgoshay v. Pugh CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MOHAMMAD RAHGOSHAY et al., | |
| Plaintiffs and Appellants, | G063534 |
| v. | (Super. Ct. No. 30-2018-00982971) |
| SAHAR S. PUGH et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Nick A. Dourbetas, Judge. Affirmed.

Law Offices of Craig J. Beauchamp and Craig J. Beauchamp for Plaintiffs and Appellants.

Milstein Jackson Fairchild & Wade, Mark A. Milstein and Mayo L. Makarczyk for Defendants and Respondents.

\*    \*    \*

Plaintiffs in this lawsuit are Mohammad Rahgoshay and MRMK, LLC (MRMK). Rahgoshay and nonparty Fariborz Wosoughkia (Kia)[1] were business partners who made three investments together. Two of these were made through MRMK, an entity they formed to pursue their investments. Defendant Sahar S. Pugh is an attorney employed by defendant Milstein Jackson Fairchild & Wade LLP (Milstein; collectively defendants). Pugh provided some assistance to Rahgoshay, Kia, and MRMK in making these investments, but the parties dispute the extent of her involvement. Plaintiffs claim Pugh orally agreed to represent them, while defendants contend Pugh was doing Kia a personal favor.

Plaintiffs lost hundreds of thousands of dollars in the three investments, and Rahgoshay and Kia's relationship deteriorated. Plaintiffs then sued defendants for legal malpractice, breach of fiduciary duty, and breach of oral contract. Generally, plaintiffs alleged that Pugh had provided deficient legal services in connection with the three investments. After a bench trial, the trial court ruled in defendants' favor. It largely relied on the testimony of Pugh and Kia, who both testified that defendants never provided legal representation to Kia or plaintiffs. The court subsequently entered judgment in defendants' favor.

Plaintiffs' contentions on appeal are difficult to parse, and many of their arguments are not clearly articulated. They appear to primarily argue that the trial court erred in finding Kia's and Pugh's testimony to be credible. But plaintiffs misconstrue the legal standard for challenging credibility findings and have failed to show the testimony believed by the

---

[1] Fariborz Wosoughkia is also known as Mike Kia, and he was referred to as Mr. Kia during trial.

2

court was "'"unbelievable *per se*,"' physically impossible or "'wholly unacceptable to reasonable minds.'"" (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.)

We also reject plaintiffs' apparent contention that the trial court erred in finding no oral contract and no attorney-client or fiduciary relationship between defendants and plaintiffs. While plaintiffs have cited evidence from which the lower court could have ruled differently, they have not shown that its findings are unsupported by substantial evidence.

The judgment is affirmed.[2]

## FACTS AND PROCEDURAL HISTORY

### I.

### THE INVESTMENTS

Rahgoshay and Kia met in early 2015 and agreed to partner together to make investments. When they met, Rahgoshay had a real estate broker's license and invested in real estate.

Rahgoshay and Kia's first investment occurred prior to MRMK's creation. They invested in ModTech Global, Inc. (ModTech), which had created a media streaming device that was compared at trial "to a more advanced [Amazon] Fire Stick." Kia and one of ModTech's principals signed a memorandum of understanding (MOU) in November 2015. Under the MOU, Rahgoshay and Kia agreed to purchase 25 percent of ModTech's stock in exchange for eight total payments of $1,500,000, with an initial payment of $100,000. This 25 percent ownership share was supposed to be held by an

---

[2] We grant plaintiffs' unopposed motion to correct misstatements and missing citations in their opening brief. (See Cal. Rules of Court, rule 8.204(e)(2)(A).) We also grant their motion to augment the record. (See Cal. Rules of Court, rule 8.155(a).)

entity to be created called "WR," which would have signing authority for ModTech's bank account.

Around this time, ModTech, Rahgoshay, and Kia began sharing an office suite in a building in Newport Beach. Their suite was next door to Pugh's office. Kia and Pugh met around late 2015, due to the proximity of their respective offices. According to Pugh, she and Kia "were both kind of social." After they met, he was in her office all the time and "constantly . . . asking [her] for favors" like "us[ing] the copy machine or send[ing] an e-mail on his behalf." According to Pugh, Kia started asking for help with investments in late 2015 or early 2016. She was happy to assist since "[Kia] was a co-tenant," "friendly," and "seemed like he needed some help." She also explained that she has "an open door at [her] office, and people pop in and we help each other."

Kia introduced Pugh and Rahgoshay. Plaintiffs claim there was a meeting between Rahgoshay, Kia, and Pugh in December 2015, in which Pugh orally agreed to provide Rahgoshay and Kia with legal services for their investments. These services allegedly included forming entities to hold investments, preparing agreements for stock purchases, providing general legal counsel to Rahgoshay and Kia and any entities they formed, and conducting due diligence for potential investments. At trial, Pugh could not recall this meeting, while Kia denied any such meeting occurred.

Rahgoshay and Kia made their initial $100,000 payment to ModTech after the alleged meeting between them and Pugh in December 2015. Rahgoshay provided the funds for this investment.

After the ModTech investment, Rahgoshay and Kia incorporated MRMK in Nevada as their investment vehicle. MRMK's articles of organization list Rahgoshay and Kia as MRMK's only two managers.

4

Rahgoshay and Kia made two investments through MRMK. Shortly after its formation, MRMK invested $100,000 in Peri, Inc. (Peri), which was developing an "intelligent phone case cover." Rahgoshay provided MRMK with this investment capital.

The other investment was in ERA Ventura, LLC (ERA), which owned a nightclub and restaurant. Plaintiffs assert that MRMK invested $460,000 in ERA based on Pugh's recommendation. It invested $120,000 in February 2016, followed by investments of $240,000 and $100,000 in March and July 2016, respectively. Rahgoshay again provided the investment capital.

Plaintiffs assert that Pugh was MRMK's general counsel. The record also contains several e-mail exchanges between Pugh and various representatives of Peri and ERA concerning the investments.

II.

THE LAWSUIT

The above investments all failed, and Rahgoshay and Kia had a falling out. Plaintiffs filed this lawsuit in March 2018, alleging that Pugh had failed to exercise reasonable care in providing legal services for the investments and had prioritized Kia's interests over theirs.

As to the ModTech investment, plaintiffs claimed that Pugh was supposed to form WR to hold Rahgoshay and Kia's investment in ModTech but failed to do so. Instead, ModTech allegedly added both Rahgoshay and Kia as signatories to its bank account in place of WR based on Pugh's advice. This purportedly allowed Kia to improperly take $55,000 from ModTech's account for his personal use, which harmed ModTech and led to its failure.

Next, plaintiffs asserted that Kia had represented to them that Pugh had reviewed Peri's financial information and approved the investment.

5

However, plaintiffs claimed they later learned that Pugh had not reviewed these documents, and they would not have invested in Peri had they known this.

As for ERA, Pugh allegedly failed to inform plaintiffs of various issues that arose during due diligence. In particular, they asserted that Pugh had failed to inform them that ERA was not providing corporate records for review and that ERA's manager ceased contact with Pugh. Like the Peri investment, plaintiffs claimed they would not have invested in ERA had Pugh informed them of these issues.

Based on the above allegations, plaintiffs asserted claims against defendants for legal malpractice, breach of fiduciary duty, and breach of oral contract.

Defendants denied any oral contract between them and plaintiffs, and they also denied that there was an attorney-client or fiduciary relationship between the parties.

III.

THE TRIAL

*A. Relevant Testimony*

A bench trial was held on plaintiffs' claims. Defendants called Kia as a witness. He generally testified that Pugh did not represent either MRMK or Rahgoshay. He also denied that either he or Rahgoshay had asked Pugh to do due diligence on any investment deals. Rather, he stated that he had asked Pugh as a personal favor to send e-mails to Peri and ERA to make MRMK look like a bigger company. He further clarified that he and Rahgoshay knew Pugh was only doing them a favor and did not actually represent MRMK.

6

Pugh echoed Kia's testimony. She testified that she had sent e-mails on MRMK's behalf to potential investment targets as a favor to Kia. She also stated that Kia prepared and reviewed the relevant investment documents and that she only "transferr[ed] documents back and forth via e-mail."

Rahgoshay stated that prior to meeting Kia he had a real estate broker's license that he used for individual real estate investment. He also traded public stocks. He also testified that a meeting occurred in December 2015 between Kia, Pugh, and himself. Kia arranged the meeting, and it occurred in a small conference room in their office suite. According to Rahgoshay, at the meeting, Pugh agreed to represent him, Kia, and any investment entity they formed. However, he admitted that no one took any notes at this meeting, nor did Pugh state what she would charge for any services.

B. *Statement of Decision*

Following the presentation of evidence, the trial court ruled in defendants' favor and provided an oral statement of decision. The court prefaced its ruling by explaining, "this is a credibility determination . . . case. We have different witnesses saying different things." It then found the accounts of defendants' witnesses more credible than plaintiffs' witnesses.

The trial court relied heavily on Kia's testimony. It explained, "Mr. Kia had the most to lose by testifying in the way he did because he testified that, if [plaintiffs] were to be successful in this lawsuit and get money, that would benefit him. So he is really here testifying against his own interest, and I can't ignore that. Mr. Kia testified that he did the due diligence."

7

Further, Rahgoshay and Kia were "experienced business people" that relied on each other in making investments. Rahgoshay provided capital, while Kia "was the sweat equity partner of MRMK." The trial court believed Kia's testimony that he was the point person on all the investments and he and Rahgoshay just "used Ms. Pugh . . . . to make their company seem bigger and stronger."

As the trial court explained, "Mr. Kia was the quote/unquote lawyer here. He put together the . . . due diligence list. He was the point person for MRMK and Mr. Rahgoshay. He wrote the MOU for ModTech. Again, Mr. Kia and Mr. Rahgoshay are experienced business people. These are not two gentlemen who are in distress business wise and needed Ms. Pugh to advise them on a single thing." "Mr. Kia was MRMK's mouthpiece. He was the communicator. He was the guy who was bringing in the business. Mr. Rahgoshay did not appear to want to communicate with anyone directly, but rather through Mr. Kia. And it sounded like that was their understanding for MRMK and the relationship between Mr. Rahgoshay and Mr. Kia. And that's fine. [¶] Somebody communicates with everyone, brings in the businesses. Mr. Rahgoshay is the money guy."

The trial court acknowledged the e-mails sent by Pugh to investment targets. While those e-mails were "'a mistake and probably not prudent," the court found they did not "rise to any sort of legal duty or representation, and that is because of Mr. Kia's testimony."

Finally, the trial court concluded, "defendants were not negligent. There was no breach of fiduciary duty. There was no [oral] contract here. There was not an attorney-client [relationship]." Thus, "Mr. Rahgoshay is not entitled to recover any damages against the defendants because . . . the court does not find that there . . . is any sort of liability on the defendant's part."

8

The trial court later entered judgment in defendants' favor, which plaintiffs appeal.

DISCUSSION

"The most fundamental principle of appellate review is that "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it . . . .""" (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125–126.) "[T]he appellant must frame the issues for us, show us where the superior court erred, and provide us with the proper citations to the record and case law." (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913.) ""'As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error . . . by citation to the record and any supporting authority.""" (*Ibid.*)

I.

PLAINTIFFS' ARGUMENTS

Plaintiffs' opening brief is difficult to follow. An appellant must "'[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority.' [Citations.] Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.)

Here, the "Legal Argument" section in plaintiffs' opening brief contains four main headings, each of which we assume contains a single primary argument. (See *Pizarro v. Reynoso, supra,* 10 Cal.App.5th at p. 179.) Plaintiffs four main headings are as follows:

- "A. The Very Difficult 'Substantial Evidence Standard,"
- "B. Generally Reasonable Rules of Thumb for Judging Credibility . . . ,"

- "C. The Objection to the Trial Court's Statement of Decision," and
- "D. Defendants are Liable for Negligent Conductor Malpractice." (Boldface omitted.)

The first heading only contains two subheadings, which both discuss the applicable standard of review in this appeal. The fourth heading does not contain any subheadings.

However, the second heading contains nine subheadings, and the third heading contains five subheadings. The points made under each of these subheadings should presumably support the primary argument advanced in the main heading. (Dictionary.com (2026), at https://www.dictionary.com/browse/subheading [as of Mar. 27, 2026], archived at: https://perma.cc/U23Y-Y7KJ [defining "subheading" as "a division subordinate to a main heading or title"].) But for many of these points, it is unclear whether they support the argument advanced in the main heading, or whether they are intended to be new arguments that are detached from it. Further, many of the arguments advanced under these subheadings are not clearly articulated, making it difficult for us to analyze them.

"It is not our responsibility to act as counsel for [plaintiffs] and attempt to arrange [their] arguments coherently." (*Pizarro v. Reynoso, supra,* 10 Cal.App.5th at p. 181; *Perry v. City of San Diego* (2021) 65 Cal.App.5th 172, 188, fn. 8 ["It is not this court's role to connect the dots"].) Plaintiffs' "failure to present complete and coherent headings and legal arguments is significant because, as the appellant[s], it is [their] burden to overcome the presumption on appeal that the underlying order is correct." (*Pizarro,* at p. 181.)

10

Given the lack of clarity in plaintiffs' opening brief, we construe the points set forth in the subheadings as supporting the argument under the main heading. To the extent plaintiffs intended to raise new arguments in the subheadings distinct from the argument in the main heading, those arguments are forfeited. Their "failure to provide coherent organization to [their] arguments forfeits consideration of those arguments on appeal." (*Pizarro v. Reynoso, supra,* 10 Cal.App.5th at p. 181.)

II.

WITNESS CREDIBILITY

Plaintiffs' arguments under the first and second main headings address the same issue: witness credibility. The analysis under the first heading discusses the appropriate standard of review. The argument under the second heading appears to apply that standard of review to the trial court's credibility findings on Kia's and Pugh's testimony. This argument is divided into nine subparts (under nine different subheadings) that ostensibly explain the errors in these credibility findings. However, plaintiffs' argument is based on a misunderstanding of the applicable standard of review. As such, they have not met their burden of showing error.

Plaintiffs' argument begins by quoting case law explaining the substantial evidence standard: "Under the deferential substantial evidence standard of review, we 'liberally construe[]' findings of fact 'to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' [Citation.] 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.' [Citation.] Testimony believed by the trial court 'may be rejected only when it is inherently improbable or incredible, i.e., "'unbelievable *per se*,'" physically impossible or "'wholly

11

unacceptable to reasonable minds."'" [Citation.] "'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.'"'" (Quoting *McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257 (*McPherson*).)

Plaintiffs then attempt to define what it means for testimony to be "incredible" or "inherently improbable." (*McPherson*, *supra*, 47 Cal.App.5th at p. 257.) To ascertain this definition, they quote a passage from *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (*Kuhn*), which they believe contains the standard for "incredible" or "inherently improbable" testimony: "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (Quoting *Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.)

Plaintiffs appear to tie the standard in *Kuhn* to the standard for witness credibility. Their specific argument is difficult to parse. But they appear to believe that a trial court's credibility findings can be reversed if they are not based on logical inferences or otherwise supported by the record. In the nine subdivisions under the second main heading (Section IV.B.1 through B.9.), plaintiffs appear to argue that the trial court's credibility findings were based on unreasonable inferences or failed to account for evidence favoring plaintiffs.

We need not consider their specific arguments because plaintiffs misstate the standard for determining witness credibility. *Kuhn* does not support their argument. The passage of *Kuhn* that plaintiffs quote *was not* discussing the standard for evaluating whether testimony was "incredible" or "inherently improbable" as plaintiffs suggest. It had nothing to do with

12

witness credibility. Rather, it was explaining the proper inferences that appellate courts can make from the record. Further, *McPherson* already explains that for testimony to be "incredible" or "inherently improbable," it must be "'"unbelievable *per se*,"' physically impossible or "'wholly unacceptable to reasonable minds.'"'[3] (*McPherson*, *supra*, 47 Cal.App.5th at p. 257.)

Other appellate courts have set forth the same standard as *McPherson*. "'"[I]t is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."' [Citations.] Testimony may be rejected only when it is inherently improbable or incredible, i.e., "'unbelievable per se,'" physically impossible or "'wholly unacceptable to reasonable minds.'"' (*Oldham v. Kizer*, *supra*, 235 Cal.App.3d at p. 1065.) There must be a showing of "physical impossibility, apparent falsity or extreme outlandishness. [I]nconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court." (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149.)

In sum, to challenge the trial court's credibility findings, plaintiffs had the burden of showing relevant testimony believed by the court was "inherently improbable or incredible," i.e., "'"unbelievable per se,'" physically impossible or "'wholly unacceptable to reasonable minds.'"' (*Oldham v. Kizer*, *supra*, 235 Cal.App.3d at p. 1065.) Since plaintiffs'

---

[3] Plaintiffs also cite case law that explains substantial evidence "is evidence . . . '*of ponderable legal significance*, . . . *reasonable in nature, credible, and of solid value*.'" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.) This portion of *Bowers* is also discussing the substantial evidence standard generally. It is not providing a standard for witness credibility.

argument is based on the wrong legal standard, they have not met that burden of showing error.

While we need not do so, we will address what appears to be plaintiffs' primary contention regarding Kia's credibility. The trial court found his testimony credible in part because he was testifying against his own interest. Plaintiffs contend this was untrue because Kia had no financial interest in MRMK. They argue that Kia's distribution rights under Nevada law were dependent on a "unanimously approved operating agreement." Plaintiffs claim that MRMK never had an operating agreement, so Kia had no distribution rights. Thus, he had no personal interest in whether MRMK recovered money in this lawsuit. This argument is unpersuasive for several reasons.

First, the relevant inquiry is not whether Kia actually had a financial interest in MRMK. Rather, the question is whether Kia *believed* he had an interest in MRMK. If he did, his testimony against MRMK would still be contrary to that expected financial interest. Plaintiffs cite no evidence that Kia knew he had no financial interest in MRMK.

Second, plaintiffs have not cited any evidence that MRMK had no operating agreement. In its statement of decision, the trial court explained that it "never heard anything about an operating agreement for [MRMK], so I am not sure if there is one." Thus, it is unclear whether MRMK had an operating agreement that set forth Kia's distribution rights.

Third, plaintiffs misinterpret the applicable law. Their argument is based on Nevada Revised Statute section 86.279, which states, "'distribution' means a direct or indirect transfer of money or property . . . by a limited-liability company to or for the benefit of all holders of any one or more classes or series of its members' interests *with respect to such interests*

14

*or as otherwise provided in the articles of organization or operating agreement.*" (Italics added.) To the extent this statute governs here, the italicized portion explains that an operating agreement is not necessary to determine distribution rights. Rather, it appears an operating agreement can be used to alter the general rule that distributions are made with respect to a member's interest in the entity. Thus, even if MRMK has no operating agreement, Kia would presumably be entitled to distributions based on his interest in the entity.

III.

MERITS

The arguments under the third and fourth heading in plaintiffs' opening brief appear to challenge the trial court's factual findings that no oral contract existed and that the parties were not in an attorney-client or fiduciary relationship.

We review the trial court's factual findings under the substantial evidence standard. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: we do not reweigh the evidence. [Citation.] Under this standard of review, parties challenging a trial court's factfinding bear an "'enormous burden.'"" (*Id.* at pp. 581–582.)

Plaintiffs' argument consists of citations to evidence from which the trial court could have found the existence of an oral contract, attorney-client relationship, or fiduciary relationship. They contend (1) various e-mails show that Pugh agreed to do due diligence on some of the investments,

15

(2) there was expert witness testimony that some of the favors Pugh did for MRMK included legal services, and (3) Rahgoshay testified that Pugh offered to provide legal services in exchange for compensation.

This argument is unpersuasive. When performing substantial evidence review, we disregard evidence contrary to the trial court's findings. (*Schmidt v. Superior Court*, *supra*, 44 Cal.App.5th at pp. 581–582.) "Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Id*. at p. 582.) Plaintiffs have not met their burden of showing that the above findings are unsupported by substantial evidence.

Further, as the trial court noted, there was testimony that (1) Kia was the point person on all the deals, (2) Kia and Rahgoshay only used Pugh's name to make MRMK appear bigger, (3) Rahgoshay had a real estate broker's license and both he and Kia were experienced business people, and (4) Pugh was not paid for any of the alleged services provided to MRMK, Kia, or Rahgoshay. This evidence sufficiently supports the court's factual findings that there was no oral contract and that no attorney-client or fiduciary relationship existed between the parties.

Plaintiffs also claim that Rahgoshay provided the only testimony regarding the terms of the alleged oral contract, and they suggest the trial court erred by failing to credit his testimony. But "'[t]he trier of fact is free to reject any witness' uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary.'" (*Goehring v. Chapman*

16

*University* (2004) 121 Cal.App.4th 353, 368.) Rahgoshay has not made this showing.[4]

## IV.

### SANCTIONS

We deny defendants' request for sanctions under Code of Civil Procedure section 907, which authorizes sanctions for frivolous appeals.

"[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) "Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals." (*Ibid.*)

Due to this high standard, we are not persuaded that this appeal was frivolous. Defendants cite briefing delays that occurred during the pendency of this appeal, such as plaintiffs' requests for continuances, but it is not clear that such requests were improper. (See *In re Marriage of Flaherty*, *supra*, 31 Cal.3d at p. 650.) And while plaintiffs' contentions were unclear at times, their comprehensible arguments were not indisputably without merit. (*Ibid.*)

---

[4] Plaintiffs also appear to include an argument about proximate cause, but this argument would only apply if an attorney-client relationship existed. (*McClintock v. West* (2013) 219 Cal.App.4th 540, 554–555.)

17

## DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

SCOTT, J.